FILED
2014 Nov-13 PM 03:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRIAN SCOTT CULVER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **5:11-CV-8038-LSC-JEO** |
| | ) | **(5:07-CR-0009-LSC-JEO-1)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OF OPINION

Before this Court is the motion to vacate, set aside, or correct a sentence filed pursuant to 28 U.S.C. § 2255 on September 30, 2011, by Petitioner, Brian Scott Culver ("Culver"). In his motion, Culver challenges both his conviction and sentence. A prisoner in federal custody, such as Culver, may move the court that imposed his sentence to vacate, set aside or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255. "A habeas corpus petitioner is entitled to an evidentiary hearing on his claim 'if he alleges facts which, if proven, would entitle him to relief.'" *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (quoting

*Futch v. Dugger*, 874 F.2d 1483, 1485 (11th Cir. 1989)). However, "if the record refutes the [petitioner's] factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

## I.    Factual Background[1]

The circumstances of this case extend far beyond a single incident on the night of November 11 and early morning of November 12, 2003, but on that occasion Culver's atrocious conduct came to light. On November 11, 2003, Culver's thirteen-year-old step-daughter, K.W., did not have school and had gone to work with her mother, Sharon Brasuell ("Brasuell").[2] (Transcript of Jury Trial, Doc. 135 in *United States v. Culver*, 5:07-cr-00009-LSC-JEO-1, at 787.) After returning from his lake house in Cullman, Alabama, Culver picked K.W. up from Brasuell's workplace that afternoon and brought her to the family's home in Hoover, Alabama. (*Id.* at 787, 643.) When K.W. went to her room, she noticed a bottle of Pamprin in her bathroom that she had neither placed there nor seen before. (*Id.* at 790.) K.W. asked Culver about the bottle, and he replied, "Now that

---

[1] This Court presided over the trial and sentencing of Culver. The facts related in this opinion are as found by the undersigned from the evidence presented in both of those proceedings or as admitted by Culver in this proceeding.

[2] At the time the relevant events occurred, Brasuell was married to Culver. She had remarried by the time of trial and will thus be referred to by the name "Brasuell."

you are a woman, I am going to start treating you like a woman." (*Id.* at 791.)
Although K.W. was confused by the remark, Culver did not explain himself. (*Id.*)
Later that afternoon, while K.W. slept on the couch downstairs, Culver woke her
up, told her she had a headache, and directed her to take two blue pills that he was
holding. (*Id.* at 792.) K.W. had a "bad feeling" about the pills because she knew
that Brasuell had instructed Culver never to give K.W. any medicine because the
medicine Culver gave her made her feel "groggy" and "confused." (*Id.* at 792-93,
811.) Culver had given K.W. medicine on several occasions, both at the family's
home in Hoover and at his lake house in Cullman. (*Id.* at 792-93.) Because Culver
insisted she take the medicine, K.W. ingested one of the pills and threw the other in
the kitchen garbage can. (*Id.* at 792.) Soon after, K.W. began to feel "groggy." (*Id.*
at 793.)

That evening, Culver, Brasuell, K.W., and K.W.'s brother attended K.W.'s
cross-country banquet at school. (*Id.* at 794.) K.W. felt "out of it" at the banquet
(*Id.* at 795), and she did not eat anything. (*Id.* at 627.) K.W. did not recognize that
her name was being called to receive several awards, and she was "staggering" and
"off balance" as she walked to the stage. (*Id.* at 627-28.) When the family returned
home, K.W. went to her room, took a shower, and went to sleep. (*Id.* at 795.) At the
time Brasuell fell asleep for the night, K.W. was already in bed. (*Id.* at 630.) Culver

told Brasuell that "he was going to stay up and research an internet business on the computer in the playroom" adjacent to K.W.'s room. (*Id.* at 276, 629.)

Later that night, K.W. was jolted awake by a shock to her upper back. (*Id.* at 795.) She turned around and saw that Culver was "under the covers in bed with" her. (*Id.* at 796.) Culver was wearing a stethoscope around his neck, and K.W. "could see him shove something underneath his pillow that he was laying on." (*Id.* at 796-97.) K.W. asked Culver why he was in bed with her. (*Id.* at 796.) Culver replied, "Nothing, I didn't do anything." (*Id.*) Culver was wearing a black tank top and gym shorts at the time. (*Id.*) K.W., who had been drugged earlier and shocked awake, did not know what was going on. Law enforcement later determined that a "single acute dose" of diazepam (Valium) was present in K.W.'s blood that night. (*Id.* at 459-60.) K.W. got out of bed and went downstairs for a glass of water. (*Id.* at 796) K.W. then woke her mother and, holding her upper back, told Brasuell, "Mom, he shocked me, he hurt me. He shocked me." (*Id.* at 798.) K.W. was upset. She sat down on Brasuell's bed and pulled up her hair, and Brasuell saw "whelps" on her back. (*Id.* at 633-34.) While Brasuell examined the marks, Culver stood in the doorway of Brasuell's bedroom, "shaking" and "sweating profusely." (*Id.* at 634-35.) Brasuell confronted Culver, stating that the whelps "look[ed] like stun

gun marks" and recalling that Culver had earlier been researching stun guns and bondage holds on the internet. (*Id.* at 636-37, 740.)

K.W. and Brasuell then went into K.W.'s room and found under K.W.'s bed several strange items they had never seen, including a white purse, a stethoscope, a blood pressure cuff, a new pair of pantyhose, and a shaving kit that Brasuell recognized as Culver's from the lake house, which contained condoms and vaginal contraceptives. (*Id.* at 637, 643-44, 798-99.) Brasuell had a hysterectomy long before she met Culver, so the two did not use contraceptives. (*Id.* at 638.) Brasuell also found under K.W.'s bed two internet printouts "pertaining to underage sex and teen sex" and a vaginal syringe. (*Id.* at 638.) None of the items under the bed belonged to either K.W. or her mother. (*Id.* at 640.)

Upon inspecting the vaginal syringe, Brasuell and K.W. discovered that it contained K-Y jelly and a small white pill. (*Id.* at 799.) When Brasuell pushed the applicator, the pill and some of the jelly came out. (*Id.* at 643; 799-800.) Although Culver at first denied knowing about the syringe, he eventually admitted that he had assembled it in the playroom by K.W.'s room when he was "bored" and put it under K.W.'s bed. (*Id.* at 644, 801.) Culver told Brasuell that the pill inside the syringe was Pamprin and retrieved the Pamprin bottle from K.W.'s bathroom so that Brasuell could compare the pills. (*Id.* at 645.) Brasuell knew that K.W. did not

use Pamprin, Brasuell had never bought any Pamprin herself, and she never saw the Pamprin bottle in K.W.'s bathroom before that night. (*Id.* at 645-46.) When K.W. told her mother that Culver had given her Aleve earlier in the day, Culver went to get the bottle. (*Id.* at 649.) Brasuell saw that the bottle contained two different sizes of blue pills, which Culver alleged were a name brand and a generic mixed together. (*Id.*) Ultimately it was determined that the white pills inside the Pamprin bottle were zolpidem (Ambien) and the blue pills in the Aleve bottle were a mixture of diazepam (Valium) and alprazolam (Xanax). (*Id.* at 507-10, 517-18.)

Culver then told Brasuell that he was leaving and started putting the items that were under K.W.'s bed in a bag. (*Id.* at 650-51.) Although Culver tried to take the syringe and the pill from Brasuell, she would not let him have those items. (*Id.* at 651.) While Culver was going between the house and his Jeep to load things he was taking with him, K.W. removed from the Jeep the clear plastic box that Culver had shoved under her bed that night, and she hid it in the bushes in the backyard. (*Id.* at 801-02.) Culver searched the entire house collecting items, "frantically" looking in the cedar chest in the bedroom he shared with Brasuell and in the attic. (*Id.* at 668-69.) Brasuell called 9-1-1 while Culver was searching the house, but the police did not arrive at the home until after Culver had left. (*Id.* at 670.) Brasuell

reported to Officer Lucas ("Lucas") that she was suspicious that Culver had been sexually abusing K.W. and asked the police to search the house. (*Id.* at 141.)

During the search, the police recovered evidence of Culver's criminal activity from the family's home. For example, the Polaroid photographs that are the subject of this case were discovered by Lucas in an envelope that was stuffed between two books on a bookcase in the office space that Culver used. (*Id.* at 110, 672-74.) The office was adjacent to the playroom and near K.W.'s room. (*Id.* at 276.) Five of the Polaroid photographs depict a nude female from her waist to her thighs, and one Polaroid photograph depicts a nude male's genitalia. Lucas also found a Polaroid camera in the attic. (*Id.* at 111-12.) The camera belonged to Culver, and Brasuell had seen it both at the lake house and at the family's home in Hoover. (*Id.* at 681.)

Furthermore, Lucas recovered an Aleve bottle from the television set in the playroom. (*Id.* at 118.) As previously mentioned, it was later determined that the bottle contained a total of 37 blue tablets, 13 of which were diazepam (Valium), and 24 of which were alprazolam (Xanax). (*Id.* at 507-10.) Officer Johnson ("Johnson") found a blue pill in the kitchen garbage can, which was determined to be alprazolam (Xanax). (*Id.* at 38-39, 41, 514-15.) Johnson looked in the garbage can because K.W. had stated that she had thrown away a blue pill that Culver had given her to take

earlier, the day before. (*Id.* at 49.) Johnson also recovered a green canvas bag filled with magazines and a stun gun box from the closet of the master bedroom (*Id.* at 46, 123-24), as well as a black sex toy from inside the cushions of the couch in the playroom. (*Id.* at 64-65.) Brasuell provided the police with the vaginal syringe. (*Id.* at 170.) The pill inside the syringe and the six tablets from the Pamprin bottle were later determined to be zolpidem (Ambien). (*Id.* at 517-18.)

Later that morning, Culver returned to the family's residence, where he was arrested for domestic violence. (*Id.* at 128.) On November 14, 2003, Officer McGairty ("McGairty") returned to search the Hoover home again to make sure nothing had been overlooked. (*Id.* at 177-78.) Inside the closet of the bedroom Brasuell and Culver shared, there was an entrance to an unfinished storage space that contained a suitcase. (*Id.* at 179.) McGairty reached into an open space between the rafters in the storage area and found an 8mm videotape. (*Id.*) The videotape contained two segments: a segment that is approximately nineteen minutes long and a much shorter segment that is approximately one minute long. (*Id.* at 834.) The first segment depicts a nude female lying on her back. The only portion of her that is visible is the area from her waist to her thighs, with her hands at her sides. (*Id.* at 180.) The video depicts another individual digitally molesting the female and at one point inserting a plastic syringe into her vagina. (*Id.*) The

female appears unconscious throughout the recording. The sheets in the video were blue with snowflakes and polar bears, similar to the sheets depicted in the Polaroid photographs. (*Id.*) The second segment, though much shorter, depicts a female in a comparable position. Brasuell's son at some point discovered an 8mm RCA camcorder in the office closet, which Brasuell had provided to the police on November 13, 2003. (*Id.* at 184, 684.) Brasuell knew the camcorder belonged to Culver because she had seen it in his Jeep. (*Id.* at 685.)

The police also found other evidence inside Culver's property. At his lake house, a set of blue flannel sheets with snowflakes and polar bears was found in the master bedroom closet on November 13, 2003. (*Id.* at 315.) Brasuell had purchased the sheets in December of 2002, and they were on the bed she shared with Culver at the lake house that winter. (*Id.* at 677-78.) From inside Culver's Jeep, police recovered computer printouts of articles about the effects of Ambien and Valium, as well as an invoice for Ambien with Culver's name on it. (*Id.* at 414-16.)

The 8mm videotape and the Polaroid photographs were key evidence in Culver's prosecution. Culver's fingerprints were found on one of the photographs and on the outside of the 8mm videotape, and police were able to identify him as the individual molesting the female in the video because they were able to raise his fingerprint from the image when he turned his hand toward the camera lens while

adjusting it. (*Id.* at 456.) Brasuell identified K.W. as the female and Culver as the male in the Polaroid photographs. (*Id.* at 698-700.) She also recognized the blue flannel sheets as being those from the lake house. (*Id.* at 700-01.) Brasuell identified K.W. as the female in the video. (*Id.* at 701-02.) She recognized K.W.'s hands because K.W. painted her fingernails different colors, bit her nails, and had a birthmark on the pinky finger of her right hand. (*Id.* at 702-03, 708.)

In addition, K.W. recognized herself in the video and in the Polaroid photographs because of her fingernail polish, a birthmark that was a "red dot on [her] right pinky," and her shaved pubic area. (*Id.* at 806-07, 813.) She did not remember the video being made. (*Id.* at 813.) However, K.W. did recall an incident that occurred sometime "after Christmas" of 2002. (*Id.* at 811.) If Brasuell had to work while K.W. and her brother were on break from school, the siblings would typically go to the lake house with Culver. (*Id.* at 810.) While at the lake house during Christmas break, K.W. fell asleep on the couch watching a movie and woke up in Culver's bed. (*Id.* at 810-11.) When she woke up, her "lower half" felt "numb" and "weird," and K.W. called her mother because she was scared. (*Id.* at 811-12.)

## II.    Procedural History

On January 31, 2007, Culver was charged by indictment with one count of manufacturing child pornography in violation of 18 U.S.C. § 2251(a). A superseding indictment was issued on March 28, 2007, charging Culver with six counts of production of child pornography, one count for the videotape and five counts for the Polaroid photographs that depicted K.W., under the same statute.

Culver was represented at trial by Herbie Brewer. Mr. Brewer is an attorney with extensive experience representing criminal defendants in trials. In fact, Mr. Brewer obtained a not guilty verdict on the most serious offenses Culver faced in state court. Nonetheless, Culver was found guilty by a jury of five of the six federal counts on June 8, 2007.

This Court sentenced Culver on September 27, 2007. The minimum term of imprisonment on each count of conviction is 15 years (180 months), and the maximum is 30 years (360 months). *See* 18 U.S.C. § 2251(e). Culver's offense level was enhanced by two levels because his victim was between the ages of 12 and 16, by two levels because the victim was his step-daughter, and by two levels because the victim was under the influence of an intoxicating substance, giving him a total offense level of 33. Based on this offense level, a criminal history category of II, and the statutory mandatory minimum for each count of conviction being 180 months, the guideline sentencing range was 180 to 188 months. Culver was sentenced to a

total of 720 months: 360 months on counts 1 and 2, running concurrently, and 360 months on counts 3, 4, and 6, running concurrently, with counts 1 and 2 running consecutively to counts 3, 4, and 6.

Judgment was entered by this Court on October 3, 2007. Culver appealed his conviction, which was affirmed on March 2, 2010. *United States v. Culver*, 598 F.3d 740 (11th Cir. 2010). His petition for writ of certiorari was denied by the Supreme Court on October 4, 2010.

## III.   DISCUSSION

The majority of Culver's claims are based upon his allegation that he received ineffective assistance of counsel at trial. The United States Supreme Court has established a national standard for judging the effectiveness of criminal defense counsel under the Sixth Amendment. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court elaborated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

In order to show ineffectiveness of counsel, Culver must first demonstrate that his attorney's performance fell below "an objective standard of reasonableness," *Id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Also, in making such an evaluation, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The effectiveness or ineffectiveness of counsel must be evaluated by consideration of the totality of the circumstances. *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983). The court must remember that a defendant in a criminal case has a constitutional right only to adequate counsel; he is not entitled to the very best legal representation. *Stone v. Dugger*, 837 F.2d 1477, 1479 (11th Cir. 1988).

The second required element in a claim of ineffective assistance of counsel is a showing of prejudice. Even if counsel made an error so egregious as to be outside

the broad scope of competence expected of attorneys, a petitioner can obtain relief only if the error caused actual prejudice. *See Strickland*, 466 U.S. at 691. Prejudice means a reasonable probability that the outcome of the proceeding would have been different had the errors not occurred. *Id.* at 694.

The remaining grounds in Culver's § 2255 motion are, in fact, all alleged errors that occurred during the trial of the case. All of them are such as would normally be the subject of a direct appeal. As explained by the Eleventh Circuit, relief under 28 U.S.C. § 2255 will not be granted on those claims that could have been raised by the petitioner during his direct appeal, as follows:

> Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal. *See, e.g., United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (collecting cases).FN13 Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir.1994); FN14 and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.' " *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988) (quoting *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. Unit A Sep.1981)). Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, *Frady*, 456 U.S. at 165, 102 S.Ct. at 1593, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice. *Stone v.*

*Powell*, 428 U.S. 465, 477 n. 10, 96 S.Ct. 3037, 3044 n. 10, 49 L.Ed.2d 1067 (1976).

> FN13. In *Frady*, the Supreme Court explained:
>
>> "When Congress enacted § 2255 in 1948, it simplified the procedure for making a collateral attack on a final judgment entered in a federal criminal case, but it did not purport to modify the basic distinction between direct review and collateral review. It has, of course, long been settled that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice."
>
> 456 U.S. at 165, 102 S.Ct. at 1593 (quoting *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979) (footnotes omitted)).
>
> FN14. "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." *Mills*, 36 F.3d at 1055.

*Lynn v. United States*, 365 F.3d 1225, 1232-33 (11th Cir. 2004). Accordingly, even if the errors Culver asserts are plain and would have warranted reversal on direct appeal, they are not properly raised in this collateral attack on his judgment and sentence. Habeas relief is not warranted on these claims.

**A.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE IN ALLOWING THE ENTIRE VIDEOTAPE TO BE**

## SUBMITTED AND PLAYED FOR THE JURY DURING DELIBERATIONS

The first issue that Culver raises is that his counsel was ineffective for allowing the entire videotape to be admitted and played for the jury during deliberations. This position has two prongs: first, that the videotape should not have been admitted into evidence in its entirety, and second, that the jury should not have been permitted to review it during deliberations. These arguments will be addressed in order.

Ordinarily, when a videotape is made the subject of a charge of production of child pornography, that tape would be the centerpiece of the Government's case. Just as likely, the tape would also be introduced in its entirety without the defendant being able to interpose a meaningful objection. As the facts bear out, this case was not ordinary.

The 8mm videotape in question contains two different segments. One segment is 19 minutes long and depicts an obviously young female being molested by Culver.[3] The other segment, approximately one minute in length, was not offered into evidence by the Government. While the Government, early in the

---

[3] Members of law enforcement were able to identify Culver as the perpetrator by magnifying the friction ridge details of one of his thumbs that he happened to turn toward the camera lens while he was setting up the recording equipment. In addition, Culver stipulated that it was his thumb that was captured by the videotape and that it was his fingerprint that was discovered on the external portion of the 8 mm videotape itself. Finally, the victim identified herself as the person being molested in the longer segment.

pretrial proceedings of the case, contended that both segments depicted K.W., at trial, the Government announced that it would offer only the longer segment since it was unable to prove that K.W. was the person in the other segment.

Culver now contends that his attorney was ineffective for "allowing" the shorter segment of the videotape to be admitted along with the longer segment. However, Mr. Brewer did not simply allow the shorter segment of the videotape into evidence. Being prepared to prove that K.W. was not the subject of the shorter segment, he argued that the Government should have been prohibited from changing its position. In support of this, Mr. Brewer asserted that the Government had represented its intention to introduce the entire videotape contending that K.W. was the subject of both segments. Mr. Brewer represented that he could show that the subject of the shorter segment was not K.W. Thus, he argued that it was unfair to allow the Government to change its position and admit the longer segment alone. In other words, since Culver's thumb identified him without question as the individual molesting the female in the longer segment, his only defense was to challenge the identity of K.W. in that segment. His best hope of accomplishing this was to bring into question the Government's identity of K.W. in the shorter segment. With the Government maintaining that the females in the two segments were the same person, if the Government was wrong about the shorter segment, it

would support the conclusion that the Government was also wrong about the identity of the victim in the longer segment.

All of this imploded when the Government came to the realization that K.W. could not identify herself as the nude female in the shorter segment of the videotape. The Government was left to offer only the segment that it could prove contained child pornography. Despite Mr. Brewer's best efforts, this Court did not require the Government to stick with its assertion that K.W. was the female appearing in both segments of video.

As a result of these developments, Culver was facing, in addition to the other significant evidence, a videotape of himself molesting what appeared to be an unconscious, nude young female. A female that K.W., corroborated by her mother, would testify was herself. In a tactical decision, Mr. Brewer insisted that the shorter segment of the videotape be admitted along with the longer one so that he could argue that the tape was one event and since the female depicted in the shorter segment was not K.W., the jury should conclude that there was reasonable doubt as to the identity of the female depicted in the longer segment.

Culver now contends that this strategy constituted ineffective assistance of counsel. However, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound

trial strategy.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (quoting *Darden v. Wainwright*, 477 U.S. 168, 186 (1986)). Further, "because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Clearly Mr. Brewer's trial strategy was not only reasonable, but the best approach then available. After all, there was no question that Culver was the individual who carefully set up the camera to record himself molesting the female in the longer segment of the videotape. The only hope he had was to bring into question the identity—and for that matter the age—of the female being molested in that segment of video.  That this strategy did not ultimately succeed in producing a not-guilty verdict does not prove that Mr. Brewer was ineffective.  *See Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing *Chandler*, 218 F.3d at 1314).

The second part of Culver's argument is that Mr. Brewer was ineffective for not objecting to the jury viewing the video evidence during deliberations. This portion of Culver's argument is made in a conclusory fashion without citing to any authority. In reality, there may well be evidence that is only allowed to be viewed or heard once in a trial and is then no longer available to the jury. An example of such evidence could be deposition testimony. Rather than being simply admitted into

evidence, the deposition often times is read—or in the case of a video deposition played—for the jury. Generally the jury would not be permitted to hear it again, as it may give undue weight to that testimony as opposed to live witnesses whose testimony cannot be read again or replayed. Such is not the case with physical evidence. Videos, photographs, and other items of physical evidence would be available to the jury to inspect during deliberations. In fact, when considering Mr. Brewer's argument of misidentification, the jury would be expected to view the two segments during its deliberations so as to compare the female or females depicted in those segments. In addition, had Mr. Brewer interposed an objection to the jury viewing the two video segments, that objection would have been unfounded and thus overruled.

Mr. Brewer's decisions to insist on the admission of the shorter segment of the videotape and to not object to the jury viewing it during deliberations were strategic ones which Culver has not shown to fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Further, there is no reasonable probability that if Mr. Brewer had not insisted on the admission of the shorter segment of the videotape into evidence and had objected to the jury viewing it during deliberations, the result of the proceeding would have been different.

For the reasons set forth, *supra*, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim is due to be dismissed.

**B.    THE CLAIM THAT TRIAL COUNSEL WAS INFFECTIVE FOR FAILING TO PRESENT EVIDENCE PURSUANT TO 18 U.S.C. § 3553(a)(6) IN SUPPORT OF MITIGATION OF THE SENTENCE**

Culver asserts that Mr. Brewer was legally ineffective for failing to remind the Court that it had an obligation to sentence Culver in such a way as to avoid unwarranted disparities. Further, Culver contends that Mr. Brewer failed to provide the Court with "relevant information to help evaluate its chosen sentence compared to other similarly situated defendants." (Doc. 2 at 22-23.) Culver's argument concludes that had Mr. Brewer informed the Court of the obligation and provided the Court with the needed information, "it is highly probable that the sentencing court would have imposed a less harsh sentence so as to avoid sentencing disparities or that the Eleventh Circuit would have corrected this error on appeal . . . ." (*Id.* at 23.)

In short, this Court was aware of its obligations in sentencing Culver, and had Mr. Brewer provided this Court with each of the sentencing examples listed in Culver's brief, the sentence would not have changed. This Court when sentencing

a defendant is charged with the responsibility of considering all, not just one, of the

factors set forth in 18 U.S.C. § 3553.

> The § 3553(a) factors include: (1) the nature and circumstances of the
> offense and the history and characteristics of the defendant; (2) the need to
> reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment for the offense; (3) the need for deterrence; (4) the
> need to protect the public; (5) the kinds of sentences available; (6) the
> Sentencing Guidelines range; (7) pertinent policy statements of the
> Sentencing Commission; and (8) the need to avoid unwarranted sentencing
> disparities.

*United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008). "While the district

court must consider these factors in imposing the sentence, it is not required to

discuss each factor." *Id.* In addition, when applying the § 3553(a) factors to a

sentence, "[t]he weight to be accorded any given § 3553(a) factor is a matter

committed to the sound discretion of the district court[,] and [the Circuit Court]

will not substitute [its] judgment in weighing the relevant factors." *United States v.*

*Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007).

While some defendants enter a guilty plea and are then sentenced pursuant

to a plea agreement, Culver exercised his right to a trial by jury. With regard to a

guilty plea, the parties sometimes are able to effectively limit the information

provided to the Court by means of a circumspect presentation of the facts in the

plea agreement. *See United States v. Tripodis*, 362 F. App'x 967, 971 (11th Cir. 2010)

(citing *United States v. Boatner*, 966 F.2d 1575, 1578 (11th Cir. 1992)) ("A defendant may bargain for the plea agreement to limit the type of facts the Government may offer to the district court."). When there is a trial, however, the trial court often obtains a more complete picture of the defendant's conduct. Sometimes this is good for the defendant and sometimes it is not. In this case, it was not.

Culver's conduct in experimenting on the child he was molesting was far worse than could be described in the fact section of a plea agreement. It was not just that he was molesting the child or that he set up video equipment to document his perverted conquests, but it was also his callous disregard for the child's life, health, and safety. Once Culver's misdeeds were played out in vivid detail through the videotapes and testimony, it was this Court's obligation to structure a sentence that was consistent with the demands of 18 U.S.C. § 3553. *See Williams*, 526 F.3d at 1322. Culver's 720-month sentence conformed to the statutory requirements.

Culver insists that Mr. Brewer should have pointed out to this Court "that from 1994-1995 the 22 defendants convicted of producing child pornography received an average sentence of 79 months." (Doc. 2 at 24.) Recognizing the dated nature of this information, Culver adds that by 2007, "the mean sentence for all defendants convicted of pornography/prostitution offenses [with child victims] was

109.6 months (and 102.5 months for first time offenders)." (*Id.*) Even assuming these convictions were all for the production of child pornography, which they were not, Culver's minimum sentence for each count of conviction was 180 months. To argue that this Court would have somehow given him a sentence below the statutory minimum if this Court would have just known of these other "comparator" cases is misguided. To the extent Culver attempts to argue that this Court's sentence would have been less than 720 months if it had that information, the answer is that this Court was fully informed at the time of sentencing of sentences similar to those proffered by Culver in this proceeding. This Court took those into consideration in crafting the sentence Culver received. However, the need to avoid *unwarranted* sentencing disparities is only one of the sentencing factors this Court was required to consider. Further, the disparity between the sentence Culver received and the sentence of some other child pornographers was in his case *warranted.*

The undersigned had been either the sentencing and trial judge or the sentencing judge for several manufacturing of child pornography cases prior to handling Culver's case. Clearly, Culver's conduct called for a longer sentence than most, if not all, of the others. In addition to sentencing disparity, this Court considered the other sentencing factors including but not limited to the nature and

circumstances of the offense; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for deterrence; and the need to protect the public.

Culver's conduct was far more heinous than that of most child pornographers. He drugged a twelve or thirteen year old child with a combination of Valium, Xanax and/or Ambien so that he could molest her.[4] Had he stopped at this, he would not have been guilty of violating 18 U.S.C. § 2251. No doubt he would have been guilty of several other crimes, but not producing child pornography.

Culver chose instead to document his degenerate escapades with Polaroid photographs and videotape, thus violating the charged federal statute. Apparently he counted the recordings as a gruesome trophy. Regardless, it was not his life he was experimenting with, but the life of a child. Had she taken the second pill provided her by Culver rather than throwing it away, or had he succeeded in injecting her with the Ambien that night, the outcome could have been far worse. The same risks were also present on the occasion when he succeeded in

---

[4] On November 11, 2003, Culver succeeded in causing K.W. to ingest only Valium since she discarded the Xanax he provided her. K.W. also prevented Culver from injecting her with the Ambien-laced vaginal syringe when Culver shocked her awake with the stun gun. It is reasonable to conclude that following this same method of operation, Culver drugged her on the occasion in which he did succeed in photographing K.W.'s nude body and videotaping himself molesting her. The date of the videoed event is not precisely known. K.W. could have been twelve on that occasion.

videotaping his activity. Indeed, Culver was not convicted of drugging the child in order to molest her, or for that matter shocking her with a stun gun during the process. But he clearly did just that.

A court does not sentence within a vacuum, sealing off all but the acts constituting the actual violation. In fact, it is improper to consider only the sentencing factors in the absence of outside circumstances that make each case unique. *See United States v. Docampo*, 573 F.3d 1091, 1110 (11th Cir. 2009) ("[A] sentence is substantively unreasonable if the individualized facts of the case are not properly taken into account, and a judge simply focuses on § 3553(a)'s generally-applicable principles."). Here, it is obvious that this child would not have allowed herself to be molested, photographed, and videotaped by Culver without being drugged. It was his disregard for her life that enabled him to accomplish his foul endeavors. As such, this Court reasonably considered the totality of the circumstances and sentenced Culver to a term of imprisonment that was warranted, even if greater than that of some other child pornographers. For the reasons set forth *supra*, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

### C.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE SENTENCING

## COURT'S FAILURE TO MAKE AN INCREMENTAL DEPARTURE FROM THE GUIDELINES

Culver maintains that Mr. Brewer was legally ineffective because he failed to object to this Court varying upward rather than making an incremental departure from the guideline-calculated sentencing range. Specifically, Culver insists that this Court "arbitrarily and without discussing any incremental departure, imposed a 720 month sentence." (Doc. 2 at 38.) Culver points to the Government's request for an upward departure and represents that this Court "did not clarify whether it was granting a departure or variance." (*Id.* at 38 n.18.)

It is within the discretion of a sentencing court to impose a sentence that does not conform to the advisory guidelines range. *See Gall v. United States*, 552 U.S. 38, 47 (2007) (rejecting "an impermissible presumption of unreasonableness for sentences outside the [g]uidelines range"). Although the guidelines range should be "the initial benchmark" for an appropriate sentence, the sentencing judge must not "presume that the [g]uidelines range is reasonable" but "must make an individualized assessment [of the appropriate sentence] based on the facts presented." *Id.* at 49-50. As long as the sentencing judge properly explains his reasoning for deviating from the guidelines range, such a deviation will not be viewed as procedurally infirm. *Id.* at 51.

In contrast to a variance, which is "a sentence imposed that is outside the . . . guideline range," a departure is a modification to the guideline range that is based on the Sentencing Guidelines. *United States v. Hippolyte*, 712 F.3d 535, 541 (11th Cir. 2013). There is no requirement that a sentencing court first depart from the guideline range before considering a variance. *United States v. Cobb*, 514 F. App'x 859, 862 (11th Cir. 2013).

In conducting Culver's sentencing hearing, this Court ruled on the various objections made by him. One of those objections dealt with the inclusion of relevant conduct. Mr. Brewer argued against the conduct being considered to support an upward departure. At that time, this Court stated, "If I decide to upwardly depart, I will obviously state my reasons for that." (Sentencing Hearing Transcript, Doc. 136 in 5:07-cr-0009-LSC-JEO-1, at 27.) This Court did not depart. Departure would have resulted in a modification of the guideline range. This Court did not state reasons for an upward departure because it did not so depart. Instead, this Court clearly stated that the sentencing guideline range was 180 to 188 months. (*Id.* at 64.) However, this Court went on at that point and made clear that the guideline range was not appropriate in Culver's case. (*Id.*)

Culver, in his brief, cites this Court to a collection of unpublished cases from other circuits as well as authority issued prior to *United States v. Booker*, 543 U.S.

220 (2005), in an effort to convince this Court that it should have considered and stated the details of its consideration of an upward departure before it varied. The argument is not convincing. This Court is not required to explain on the record each sentencing option that it chooses not to utilize. Had it departed, this Court would have made that clear. Further, when a similar argument was put before the Eleventh Circuit, that court recognized that the sentencing court had imposed a variance, not a departure. *United States v. Irizarry*, 458 F. 3d 1208, 1211 (11th Cir. 2006). Here, as in that case, this Court first correctly calculated the advisory guideline range and then determined that based upon the factors listed in 18 U.S.C. § 3553, a sentence in accordance with the guideline range was insufficient. *See id.* at 1212.

Even though this Court did not discuss the nonexistent incremental departure, it did clearly state the reasons for the upward variance. (*See* Sentencing Hearing Transcript, Doc. 136 in 5:07-cr-0009-LSC-JEO-1, at 64-66.) Further, those reasons were supported by the evidence. The sentence was not arbitrary. As this Court explained, a sentence at the low end of the statutory range (with the minimum sentence possible being 180 months) was not appropriate. The nature and circumstances of the offense, the danger of Culver to society, the need to reflect the seriousness of the offense, to promote a respect for the law, to provide

for just punishment for the offense, and to afford adequate deterrence not only to Culver but to others considering such conduct, called for the sentence given. The details of Culver's conduct will not be repeated at this point, but this Court discussed Culver's conduct in sufficient detail when explaining the reasons for the sentence. For the reasons set forth *supra*, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

### D. THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROCEDURAL ERROR BY THE SENTENCING COURT

With regard to this ground, Culver is simply repeating part of the basis of his unfounded position taken in the previous section. There was no procedural error committed by the Court in sentencing him, and even if there was an objection made at sentencing, this Court would have pointed Culver back to its earlier described statements and reasoning. Certainly this Court could have gone into greater detail as to the sentence given; however, providing such detail was unnecessary.

Once again, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

### E. THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT ON THE GROUNDS THAT THE

**SENTENCE IMPOSED AMOUNTED TO CRUEL AND UNUSUAL PUNISHMENT BECAUSE OF THE DISPARITY WITH SIMILARLY SITUATED DEFENDANTS AND THE COURT'S FAILURE TO INCREMENTALLY DEPART FROM THE GUIDELINES**

Culver makes the same arguments in this section as he did in support of prior asserted grounds. For the reasons stated in those sections and the fact that the sentence imposed is not cruel and unusual punishment when evaluated against the facts of this case, this claim is also dismissed. In order to be successful on an Eighth Amendment claim, a defendant must show that his sentence is "grossly disproportionate to the offense committed." *United States v. Moriarty*, 429 F.3d 1012, 1024 (11th Cir. 2005) (quoting *United States v. Raad*, 406 F.3d 1322, 1324 (11th Cir. 2005)). Generally, a sentence that conforms to the statutory parameters "is neither excessive nor cruel and unusual under the Eighth Amendment." *Id.* (quoting *United States v. Delacruz-Soto*, 414 F.3d 1158, 1168 (10th Cir. 2005)). Culver's sentence falls within the statutory range. Any such objection made by Mr. Brewer would have been overruled.

F.    **THE CLAIM THAT THE SENTENCE IMPOSED AMOUNTED TO CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT BECAUSE OF THE DISPARITY WITH SIMILARLY SITUATED DEFENDANTS AND THE COURT'S FAILURE TO INCREMENTALLY DEPART FROM THE GUIDELINES**

Culver makes the same arguments in this section as he did in support of prior asserted grounds. For the reasons stated in those sections and the fact that the sentence imposed is not cruel and unusual punishment when evaluated against the facts of this case and the procedure followed in sentencing, this claim is also due to be dismissed.  In addition, as explained earlier, such a ground would have to be presented on direct appeal or would be waived. *See Lynn*, 365 F.3d at 1232-33.  It was not and is thus barred. This claim is due to be dismissed.

### G.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE SENTENCING COURT'S PUNISHMENT OF CULVER FOR INVOKING HIS RIGHT NOT TO TESTIFY

At sentencing, when this Court was beginning to explain the rationale for the sentence it was about to impose, it responded to a statement that had just been made by Culver. Culver insisted not only that he was innocent but also that some of this Court's rulings prevented him from taking the stand. That statement, particularly Culver's assertion that he had been prevented from testifying in his own case, was not one that this Court felt should go unanswered. With regard to his assertion that he was not guilty of wrongdoing, this Court pointed to the jury verdict. As to his claim of not being able to testify in his own case, this Court reminded him, "You could have taken the witness stand; you made the decision

not to." (Sentencing Hearing Transcript, Doc. 136 in 5:07-cr-0009-LSC-JEO-1, at 64.) It was as simple as that.

Culver now attempts to paint this Court's statement as evidence that he was sentenced for not testifying and that Mr. Brewer was ineffective for not objecting on that ground. In reality, Culver's not testifying had nothing at all to do with his sentence. Actually, had he testified, it is apparent from his denial of guilt and his complete lack of remorse at sentencing that he would have denied the alleged conduct despite the stipulation and other evidence that he was the molester in the videotape. If he had testified as expected and if the jury had then returned a guilty verdict, Culver would have possibly appeared to have been obstructing justice under the application of the guidelines. Regardless, his failure to testify played no role whatsoever in his sentence. Had Mr. Brewer objected on that basis, it would not have changed the outcome. This Court would have simply made clear that its statement had nothing to do with sentencing.

With regard to this claim, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

### H. THE CLAIM THAT THE SENTENCING COURT COMMITTED PLAIN ERROR IN PUNISHING CULVER FOR INVOKING HIS RIGHT NOT TO TESTIFY

Culver makes the same arguments in this section as he did in support of the previous claim. For the reasons stated in that section, this claim is also dismissed. In addition, as explained earlier, such a ground would have to be presented on direct appeal or would be waived. It was not and is thus barred. *See Lynn*, 365 F.3d at 1232-33.

## I.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE SENTENCING COURT'S PUNISHMENT OF CULVER FOR EXERCISING HIS RIGHT TO TRIAL OR TO APPEAL THE COURT'S ERROR

First, it is unclear how this Court could have punished Culver for "exercising his right . . . to appeal the court's error." (Doc. 2, at 57.) Culver did not appeal anything until after he had been sentenced. Thus, Mr. Brewer had no opportunity to object to something this Court could not have done.

However, as to Culver's assertion that Mr. Brewer was legally ineffective for failing to object to this Court sentencing him more harshly for exercising his right to trial, such is unfounded.  Culver ties this assertion to a statement made by this Court that he takes out of context. This Court actually, in responding to Culver's non-remorseful denial of guilt, stated the following:

> What is appropriate is for me to consider the fact that you are guilty, you are guilty of what the jury says you did, what I saw on those videotapes, when I saw that child

back there, sit there for fifteen minutes on the stand and sob while she had to watch herself be abused again and again by you, what you did do is you took her childhood away from her and you put yourself in this situation. There is no doubt in my mind that that was a child in the videotape. There is no doubt in my mind that it was her. The jury confirmed that. There is no doubt in my mind that it was you who was doing the abusing and there is no doubt in my mind that that person was unconscious when you were abusing her.

(Sentencing Hearing Transcript, Doc. 136 in 5:07-cr-0009-LSC-JEO-1, at 65.)

When making his statement to this Court at sentencing, Culver proclaimed his innocence and stated "[a]nd how we got here, I have no idea." (*Id.* at 63.) He also, seeking sympathy, pointed out to this Court "[t]hat there has been a lot of sobbing on both sides." (*Id.*) But even though he acknowledged by his evidentiary stipulation during trial that he was the individual molesting the female in the videotape, he insisted that he was innocent. This left only one possible way he could be innocent of the charges: that the female in the video tape was not a child and was not K.W. When this Court made the above statements, it was responding to Culver's assertion of innocence and his play for sympathy. In recognizing that K.W. sobbed while watching herself be molested, the Court's statement was just that: a description of a physical reaction that K.W. had further corroborating her identification of herself in the videotape.

When sentencing an individual, even someone guilty of such a horrible crime, this Court recognizes a need to consider and address potentially mitigating factors put forth and to answer legitimate questions posed by the individual being sentenced. *See* Subpoint B, *supra*. Culver had questions and had put forth what he believed were mitigating factors. For example, he asserted his belief that he was innocent. He pointed to the fact that there had been "sobbing on both sides" and expressed confusion as to how he got where he was. This Court expects that his profession of innocence was an act; however, Culver's statements called for a response as to why this Court was convinced that he was guilty. The statement by the Court that Culver now challenges was part of that explanation. K.W. could not, in this Court's opinion, have faked her reaction to that videotape. She was clearly shaken to her core. This, along with all of the other evidence, left no doubt that she was the child in the videotape.

This Court did not punish Culver more severely because he went to trial. The sentence he received was exactly what was appropriate under the facts when the guideline range was considered and the sentencing factors in 18 U.S.C. § 3553 were properly applied. *See* Subpoints B and C, *supra*. Any objection by Mr. Brewer would have been unfounded and thus overruled. With regard to this claim, Culver

has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

## J.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CALL AN EXPERT TO ESTABLISH CULVER'S UNLIKELIHOOD OF RECIDIVISM

Culver, who has at all times denied his guilt, argues that his trial counsel was legally ineffective for failing to call an expert at sentencing to establish that he is unlikely to recidivate. In support of this position, Culver offers what is titled as "Confidential Forensic Recidivist Risk Report" (hereinafter "the report"), apparently prepared by Frankie L. Preston ("Preston"), a licensed psychologist. As will be explained, Culver cannot show that he was prejudiced by Mr. Brewer's failure to present the report or similar evidence at sentencing because the Court would not have deemed the report credible in light of the facts of this case, and even assuming the report contained credible and accurate information, it nowhere establishes that Culver will not reoffend.  As such, a report of this type would not have affected the sentence imposed.

As an initial matter, the Court notes that contents of the report were not pleaded as facts in Culver's petition, nor did he request leave to amend his petition

to plead any additional facts related to the report.[5] Because the report is merely opinion evidence offered in support of one of Culver's claims, and does not raise a contested factual issue, Culver's submission of the report at the eleventh hour does not necessitate an evidentiary hearing in this action. *Cf. Alvarez-Sanchez v. United States*, 350 F. App'x 421, 423-24 (11th Cir. 2009) ("Ordinarily, contested factual issues in a § 2255 proceeding may not be determined based solely on affidavits.") (citing *Montgomery v. United States*, 469 F.2d 148, 150 (5th Cir. 1972) (holding that "contested fact[ual] issues in § 2255 cases must be decided on the basis of an evidentiary hearing, not affidavits")).

This Court applied, as one of the sentencing factors found in 18 U.S.C. § 3553, the need to protect the public. Specifically, this Court stated that Culver was a danger to society if he was allowed to walk the streets, and noted the danger "that one day [Culver] will have the opportunity to do this to another child." (Sentencing Hearing Transcript, Doc. 136 in 5:07-cr-0009-LSC-JEO-1, at 65.) Clearly this is a factor that this Court is charged with considering at sentencing.

---

[5] In fact, Culver did not submit the report until he filed his reply brief, after the Government had already submitted its response in opposition to Culver's § 2255 motion. On December 13, 2011, the same day on which the Government's response brief was due and in which the Government in fact submitted its response brief, Culver filed a motion asking that the Court allow Culver to file the report under seal. (Doc. 10.) The Court granted the motion and filed the report under seal as Document 11 the following day. Culver asserts that a copy of the report was delivered to the Government on December 13, 2011, as well.

The Court finds that the report is of little to no value on the issues at hand. First of all, had this Court been presented with the report at sentencing, it would have found it unsupported and not credible. Mr. Preston spends a significant amount of time in his report questioning the evidence against Culver. For example, he describes the identification of "stun gun markings" as "seem[ing] vague." (Doc. 11 at 13.) He goes on to describe the identification of K.W. as the child on the videotape as "lacking in terms of evidentiary standards (e.g. *Daubert*)." (*Id.*) This Court has never encountered an "expert on mental health issues" who apparently believes himself enough of an expert on the law so as to qualify him to give a gratuitous opinion of the Court's rulings on evidentiary matters. This is particularly troubling when such legal opinions should not factor into the subject matter that his legitimate opinion is supposed to cover. Had the report been presented to this Court prior to Culver's sentencing, the Court would have read it then, as it does now, as indicating an obvious bias in favor of Culver and against the Government.

The Court also would not have found the report "helpful" to determining Culver's sentence under traditional principles governing the admissibility of expert testimony. *See* Fed. R. Evid. 702; *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (explaining that the Federal Rules of Evidence provide a

three-part test governing the admissibility of expert testimony, which requires that (1) the testimony is based upon sufficient facts or data, (2) the expert's methodology underlying his or her conclusion is sufficiently reliable under *Daubert*, and (3) the expert applied the principles and methods reliably to the facts of the case, such that the testimony will be helpful to the trier of fact). The report lists various studies relative to sex offenders and recidivism, lays out a biographical sketch of Culver, describes generally the results of an MMPI-II-RF test administered on Culver that found him not to be suffering from mental disease or defect, acknowledges that Culver completely denies his guilt, and then concludes that "Mr. Brian Scott Culver is forensically considered at low recidivism risk in comparison to the convicted sex offender population . . . ." (Doc. 11 at 14.)

Mr. Preston's report asserts that the sex offenders who plead guilty and those who are found guilty experience the same rate of recidivism. Even if this is true, there is no indication of any effort by Mr. Preston to take into consideration the specific facts about Culver and his crime in determining his likelihood of recidivism. Apparently, Mr. Preston is of the opinion that one child pornographer is no different from any other. This Court does not find that credible now, and it would not have accepted that at sentencing. While Mr. Preston administered several personality tests on Culver; he chose not to account for the particular facts

of this case, which show Culver's proven willingness to do anything necessary to videotape himself molesting a child. As described earlier, Culver was willing to risk the life of the child to molest her. His store of drugs and retention of video and photographic trophies clearly demonstrated his intention to repeat the offense again and again. Additionally, the fact that Culver continued to deny his guilt in the face of the overwhelming evidence against him (including but not limited to the videotape, his stipulation as being the person doing the molesting in such video, the photographs, various unexplained drugs, his admission concerning those drugs, burn marks on the back of K.W.'s neck, an empty stun gun box in his closet, printouts on underage and teen sex, and his fingerprints on evidence) brings into question the reliability of any evidence that depends on the accuracy of testing, when Culver is providing the answers for such tests. The foregoing demonstrates that even if Mr. Brewer chose to present an expert at sentencing with the opinion so stated in Mr. Preston's report, it would not have resulted in a lower sentence.

Additionally, based upon the posture of Culver, i.e., his denial of guilt, it is also unlikely that Mr. Brewer would have offered such evidence in the first place. Even in sentencing, an attorney's performance must be evaluated with an eye toward strategy. Calling such a witness when his client was professing innocence would have risked an interpretation that he was acknowledging guilt in one instance

but denying it in the other. For the little benefit Mr. Brewer could have hoped to gain for his client, it is unlikely that he would have taken such inconsistent positions. *See LeCroy v. United States*, 739 F.3d 1297, 1318 (11th Cir. 2014) ("We cannot fault [petitioner's] defense attorneys for wanting to avoid this kind of testimony . . . . [Petitioner's defense] attorneys made a tactical choice that the mitigating value of expert mental health testimony would be outweighed by the aggravating information the Government would emphasize, and on this record we cannot say their choice was unreasonable for *Strickland* purposes.").

Finally, even assuming for the sake of argument that the report or similar evidence was credible, even under the best scenario for Culver, Mr. Preston expresses the opinion that there is still *some* risk that Culver would recidivate. As such, the relevant factors of deterrence and the need to protect the public would then still call for a lengthy incarceration since his method of committing his crime of choice was not just to photograph nude children, but was instead to risk their lives by drugging them into a coma-like state and then videotaping himself molesting them. Additionally, there are other sentencing factors that were and must be considered, such as the nature and circumstances of the offense and the history and characteristics of the defendant and the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for

the offense. If the report or similar evidence would have been presented by Mr. Brewer, it is without question that the sentence would still have been the statutory maximum of 720 months. Anything less would have failed to recognize the circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

With regard to this claim, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

### K.   THE CLAIM THAT THE COURT ERRED BY USING A FACTOR NOT IN EVIDENCE TO ARBITRARILY DEPART FROM THE GUIDELINES AND COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN FAILING TO OBJECT TO THIS ERROR OR RAISE IT ON APPEAL

In this argument, Culver asserts that there was no evidence that he would be a danger to "do this to another child." Culver then uses that as a basis for his claim that Mr. Brewer should have objected when the Court stated as much.   The position Culver takes in the previous subsection demonstrates that his premise is incorrect.   Even the report described in the previous section did not rule out all likelihood of Culver recidivating.   Additionally, there was ample evidence presented to support the conclusion that Culver would likely reoffend if given the

chance. The fact that Culver retained the videotape of himself molesting the child and Polaroid photographs of her nude body along with a Polaroid photograph of his own genitalia is evidence of how treasured the activity was to him. Culver did not simply participate in molesting the child but stored a recording of it so that he could relive it whenever it pleased him. In addition, there was a yet-to-be-identified female on the shorter segment of the videotape that Mr. Brewer made clear he was going to prove was not K.W. The identity and age of that person were not established. Further, evidence such as the quantity of drugs Culver had gathered for use in his criminal pursuits points to him expecting to utilize those drugs in multiple events.

Any objection as to the lack of evidence on this point would have been unfounded and thus overruled. With regard to this claim, Culver has failed to show that Mr. Brewer's performance was deficient, or that he suffered any prejudice from it. Accordingly, this claim also is due to be dismissed.

## L. THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE DEPARTURE BASED ON U.S.S.G. § 5K2.8

This Court did not depart. As explained in the preceding sections, this claim is unfounded and is thus due to be dismissed.

## M.   THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE SENTENCING COURT'S EXTREME DEPARTURE WITHOUT ADEQUATE NOTICE

This Court did not depart. As explained in the preceding sections, this claim is unfounded and is thus due to be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Culver's motion to vacate, set aside, or correct a sentence filed pursuant to 28 U.S.C. § 2255 on September 30, 2011, is due to be denied and this action dismissed with prejudice.

This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Petitioner's claims do not satisfy either standard.

An appropriate order will be entered.

Done this 13th day of November, 2014.

L. SCOTT COOGLER

UNITED STATES DISTRICT JUDGE
[160704]